



APR 1 4 2014

Clerk, U.S. District Court

By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

KAMAL K. PATEL,

     Plaintiff,

Vs.

PEACE, INC.,
WILSON PARMAR,
GRACE PARMAR,
HOLIDAY INN EXPRESS & SUITES-PRATT,
BANK OF AMERICA, N.A.,
JOHN OR JANE DOE # 1, and
JOHN OR JANE DOE #2,

     Defendants.

Civil No. *14-4026-RDR-KGS*

(To Be Supplied By Clerk)

---

# CIVIL COMPLAINT
# FOR A CONSTRUCTIVE TRUST
# AND DAMAGES FOR BREACH OF CONTRACT
# AND FOR UNLAWFUL RACKETEERING UNDER THE CIVIL RICO ACT
### *(JURY TRIAL DEMAND)*

---

TO THE HONORABLE JUDGE OF THIS COURT:

    **NOW COMES**, the Plaintiff, **KAMAL K. PATEL**, Pro Se, an Assignee of David, Inc. and of

Atul Patel, M.D., and submits this Civil Complaint for a Constructive Trust and for Damages for Breach

of Contract and for Unlawful Racketeering under the Civil RICO Act.

# I.

## NATURE OF ACTION

In 2005, Atul Patel, M.D. ("Dr. Patel") entered into an agreement with Wilson and Grace Parmar ("Parmars") to jointly build and operate a motel in Dodge City, Kansas under the La Quinta Inns & Suites ("La Quinta") franchise.  David, Inc. was formed for this joint venture.  Dr. Patel owned 60% of the shares, the Parmars owned 30% and another party owned 10%.  The Parmars were made Directors of David, Inc. and put in charge of all operations as General Managers of the La Quinta.  The La Quinta was constructed and began operations in 2007.

In early 2008, an opportunity was presented for expansion into the Pratt, Kansas market.  Although prohibited from self-dealing as Directors of David, Inc., the Parmars decided to usurp this opportunity for themselves.  Even though they did not have the financial resources to expand on their own, this was not to be an impediment.  They devised, implemented and successfully carried out various unconscionable and illegal schemes to steal the necessary monies from multiple victims, which included David, Inc., as well as others with whom they were in business, including Wilson Parmar's own brother, other Peace, Inc. shareholders, K & A Motel, Inc., and Dodge City Hospitality, Inc.

Some of the Parmars' schemes included (i) Setting up phony bank accounts under David, Inc. to siphon off its assets, (ii) Withdrawing large sums from David, Inc. accounts either as direct wire transfers or as cashiers' checks payable to themselves which would then either be deposited into their personal accounts, into accounts of Peace, Inc., a corporation they owned and controlled, or to be sent to India to be laundered and repatriated back to the U.S., (iii) Obtaining large cash advances on their credit cards and then using David, Inc. monies to pay off the credit card statements, (iv) Stealing incoming David, Inc. checks and depositing them into the phony bank accounts for eventual misappropriation and (v) Paying for the land on which the HIE-Pratt was build from David, Inc. accounts.  They concealed their malfeasance by using their controlling role as Directors and General Managers to deny other shareholders access to documents, by using their personal residence address as the corporate address on the bank

accounts, by laundering the money through India, and by removing the original accountant and replacing her with one of their choosing.

A Bank of America employee was recruited by the Parmars to assist them in some of the schemes which included assisting them in changing the address on the David, Inc. account to facilitate concealment, opening phony accounts in the corporate name, and enabling structuring of large cash transactions in a way as to avoid CTR requirements.

Evidence will show that through these various schemes, the Holiday Inn Express & Suites in Pratt, Kansas ("HIE-Pratt") was financed and constructed.

## II.

## PARTIES

1. **KAMAL K. PATEL** (hereinafter "Plaintiff" or "Patel") is the Plaintiff. Patel is suing as an assignee of David, Inc. and of Atul Patel, M.D. Plaintiff is a citizen of the United Kingdom of Great Britain. His current mailing address is:

Kamal K. Patel
3409 Deer Valley
Edmond, OK 73034
(214) 870-1687
kamalkpatel@icloud.com

2. **PEACE, INC.** is a Defendant. Peace, Inc. is a Kansas corporation with its principal place of business in Pratt, Kansas. It is a corporation engaged in a business affecting interstate commerce. The following addresses are applicable to Peace, Inc.:

**Principal Place of Business**
Peace, Inc.
1903 Pauline Place
Pratt, KS 67124

**Registered Agent**
Peace, Inc.
c/o Wilson Parmar
2400 W. Wyatt Earp Blvd.
Dodge City, KS 67801

3. **WILSON PARMAR** (hereinafter "Wilson" or collectively with Grace Parmar as "Parmars") is a Defendant. He is a "person" as defined by 18 U.S.C. § 1961(3). He is a citizen and resident of Kansas with the following address:

Kamal K. Patel v. Peace, Inc.
Civil Complaint

Wilson Parmar
1903 Pauline Place
Pratt, KS 67124

4.  **GRACE PARMAR** (hereinafter "Grace" or collectively with Wilson Parmar as "Parmars") is a Defendant.  She is a "person" as defined by 18 U.S.C. § 1961(3).  She is a citizen and resident of Kansas with the following address:

Grace Parmar
1903 Pauline Place
Pratt, KS 67124

5.  **BANK OF AMERICA, N.A.** (hereinafter "BAC") is a Defendant.  BAC is a Delaware corporation with its headquarters in North Carolina.  Its addresses are as follows:

| **HEADQUARTERS** | **REGISTERED AGENT** |
|---|---|
| Bank of America, N.A. | Bank of America, N.A. |
| 100 N. Tyrone St. | C/o CT Corporation System |
| Charlotte, NC 28202 | 150 Fayetteville St. |
| | Raleigh, NC 27001 |

6.  **HOLIDAY INN EXPRESS & SUITES-PRATT** (hereinafter "HIE-Pratt") is a Defendant.  It is a motel engaged in activity affecting interstate commerce with its principal place of business in Pratt, Kansas.  Its address is:

Holiday Inn Express & Suites
1903 Pauline Place
Pratt, KS 67124

7.  **JOHN OR JANE DOE #1** (hereinafter "Doe #1") is a Defendant identified as an employee of Bank of America, N.A. at the Dodge City branch of BAC who assisted the Parmars.  Doe #1 is alleged to be a resident and citizen of Kansas.

8.  **JOHN OR JANE DOE #2** (hereinafter "Doe #2") is a Defendant identified as the Accountant hired by the Parmars as the accountant for David, Inc. between the years of 2008 and 2011.  Doe #2 is alleged to a resident and citizen of Kansas.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

## III.

### JURISDICTION & VENUE

9.   Plaintiff is a citizen of the United Kingdom of Great Britain, a foreign nation.  Plaintiff's current residence is in the State of Oklahoma.

10.   All defendants are residents and/or citizens of the United States and of states other than Oklahoma.  The Parmars are citizens of Kansas.  Peace, Inc. is a Kansas corporation.  BAC is a Delaware corporation headquartered in North Carolina.   Complete diversity exists between Plaintiff and all defendants.  The amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.00.  Jurisdiction exists under Title 28 U.S.C. § 2332(a)(2).   Venue is also proper under Title 28 U.S.C. § 1391(b)(1), (b)(2), & (c).

11.   Jurisdiction is also proper under the Civil RICO provisions of Title 18 U.S.C. § 1964(c).  Personal jurisdiction and venue exists under 18 U.S.C. § 1965(a).

12.   The Court's supplemental jurisdiction is invoked to hear and decide any claims which arise under state law.

## IV.

## FACTUAL ALLEGATIONS

### A.  BACKGROUND.

13.  In early 2005, Dr. Patel sat down with Wilson and Grace Parmar (the Parmars) to discuss a joint business venture involving the construction of a La Quinta Inn & Suites in Dodge City, Kansas.

### B.  DR. PATEL'S CONTRACT WITH THE PARMARS.

14.  During this meeting, agreements were reached between Dr. Patel and the Parmars on various matters relating to the La Quinta project which included the following:

(a) Dr. Patel and the Parmars agreed that they would develop a La Quinta Inn & Suites in Dodge City, Kansas and that a corporation under the name of David, Inc. would be formed for this development with Dr. Patel owning 60% of its shares, the Parmars owning 30% and a third party to own 10%.

(b) It was acknowledged between the parties that the Parmars did not have all the capital necessary for a full 30% interest in David, Inc.  The parties agreed that Dr. Patel would loan the Parmars money in order for the Parmars to acquire the full 30% interest.  Dr. Patel could have increased his own personal stake in David, Inc.  However, Dr. Patel agreed to finance the Parmars' increased stake because Dr. Patel wanted the Parmars to be happy and satisfied with their percentage ownership so as to foster loyalty, fidelity and hard work.  Dr. Patel did in fact loan the Parmars thousands of dollars, interest free, for this increased stake in David, Inc.  It was both implicitly and explicitly understood by the parties that this agreement obligated the Parmars to exercise the utmost degree of honesty, trustworthiness, and integrity and prohibited any dishonesty.

(c) The Parmars were to be made Directors of David, Inc. and General Managers in charge of all day-to-day operations of the La Quinta.  The Parmars were to receive a salary in addition to their share of the profits and did in fact receive such a salary.

(d) The parties also discussed operational aspects of the La Quinta.  It was acknowledged that the business would involve large amounts of cash.  Dr. Patel expressly demanded complete honesty, integrity and meticulous accounting of all monies received and expended.  This condition was non-negotiable and a deal breaker should the Parmars refuse.  The Parmars expressly agreed to Dr. Patel's conditions and agreed to provide full, complete and honest accounting.  As part of this agreement, it was expressly agreed upon that the Parmars would not use any corporate property for improper personal gains.

(e) It was expressly agreed upon that the Parmars would discharge their duties on the Board and as Directors with the highest degree of care, loyalty, fidelity, trustworthiness and good faith.

(f) It was expressly agreed upon that the Parmars would discharge their duties as General Managers with the highest degree of care, loyalty, fidelity, trustworthiness and good faith.

15.  Dr. Patel gave valuable consideration in reliance of these promises outlined at ¶ 14(a) through (f), supra, including:

(a) Dr. Patel brought the financing for the project in the millions of dollars and used his personal guarantees `thereby placing his other assets at risk.  The Parmars could not obtain the financing on their own and without Dr. Patel, the project t could not have been financed.

(b) Dr. Patel loaned the Parmars thousands of dollars, interest free, so that the Parmars could make the down payment contribution necessary for a 30% stake in David, Inc.

(c) Dr. Patel provided his share of the down payment in addition to helping the Parmars with their share.

(d) Dr. Patel entered into a business venture which he would not otherwise have entered but for the promises outlined above at ¶ 14(a)-(f).

(e) The Parmars received a significant salary and profits as well as a significant stake in a brand new hotel having only to put up a fraction of its actual cost and without having to bring their own financing.

16.  The Parmars' contractual obligations, as described at ¶ 14(d)-(f), supra, contained an *implicit term* that the Parmars would discharge their obligations in good faith.

17.  Dr. Patel has a property interest in his profits from the operation of David, Inc. and in his shares of David, Inc., whose value is directly related to the profitability of the La Quinta.

18.  The La Quinta was constructed in Dodge City, Kansas and opened operations sometime in 2007.

19.  Dr. Patel gave valuable consideration to the Parmars as described at ¶15 in exchange for the promises described above at ¶¶ 14(d) to 4(f) and 16.  Dr. Patel fulfilled all of his contractual obligations to the Parmars.

20.  The Parmars, as Directors of David, Inc. and as General Managers of the La Quinta, were contractually obligated under the terms of the agreement as described at ¶¶ 14 and 16 to provide Dr. Patel with the highest degree of care, loyalty, fidelity and trustworthiness, which included the express mandate to provide a complete and honest accounting of all monies.

21.  As the following paragraphs will described in detail, the Parmars, while acting in their capacities as Directors and General Managers, breached their contractual obligations to Dr. Patel by

Kamal K. Patel v. Peace, Inc.
Civil Complaint

engaging in various schemes of artifice through which the Parmars concealed and misappropriated hundreds of thousands of dollars from David, Inc. and the La Quinta Inn, and operated under an actual conflict of interest manifested by the self-dealing in which they usurped David, Inc.'s corporate opportunity and constructed a Holiday Inn Express in Pratt, Kansas for themselves using embezzled David, Inc. monies.

22.  Dr. Patel has suffered significant monetary damages as a direct and proximate result of the Parmars' breach of contractual obligations.

23.  All of Dr. Patel's rights under the contract described in the preceding paragraphs have been assigned to Plaintiff Kamal K. Patel.

## C.  DAVID, INC.'s CONTRACT WITH THE PARMARS.

24.  David, Inc. is a corporation which owns the La Quinta Inn & Suites motel in Dodge City, Kansas.

25.  David, Inc. entered into a contract with the Parmars in which the Parmars (i) were made Directors of David, Inc. with Wilson Parmar named as the President and (ii) were employed as General Managers of the La Quinta in charge of all operations.

26.  Both the Parmars received a salary for their jobs as Directors of David, Inc. and as General Managers of the La Quinta Inn as well as profits corresponding to their percentage ownership of shares.

27.  David, Inc. entered into the contract with Wilson and Grace Parmar in which the Parmars, in exchange for the consideration as described above, would serve as **_Directors_** of David, Inc. and provide the following services:

(a) Devote their full time and exclusive services to the affairs of David, Inc.;

(b) Act in the best interests of David, Inc.;

(c) Act with the utmost good faith on behalf of David, Inc.;

(d) Avoid any situations which would cause them to have a conflict of interest;

(e) Bound themselves to a duty of loyalty and care to David, Inc.;

(f) Refrain from self-dealing, from usurping corporate opportunity, and from receiving any improper personal benefits;

(g) Refrain from making any unauthorized expenditures, withdrawals, and distributions of any corporate funds or sale of its assets; and

(h) Keep all shareholders fully informed of all material matters relating to David, Inc., including a full accounting on a monthly basis of all monies received and expended, and any corporate opportunity which may present itself, and any other matters which would be considered important.

28.   David, Inc. entered into the contract with Wilson and Grace Parmar in which the Parmars, in exchange for the consideration as described above, would serve as **General Managers** of the La Quinta Inn and provide the following services:

(a) The Parmars would use the highest degree of good faith towards the employer;

(b) The Parmars would not profit at the employer's expense beyond the terms of the employment agreement;

(c) Meticulously account for all monies received and expended including a prohibition from any misappropriation, embezzlement, theft and personal use of employer monies; and

(d) Operate the La Quinta Inn in the best interests of David, Inc. and its shareholders.

29.   The terms of the contract as described at ¶¶ 27 & 28, supra, were implicit in the contract as were the implicit requirement that all performance was to be made in good faith.

## D.  DAVID INC.'s CONTRACT WITH BANK OF AMERICA, N.A.

30.   David, Inc. opened a bank account with Bank of America, N.A. (BAC) for the La Quinta Inn.

31.   BAC and David, Inc. entered into a contractual agreement in which BAC, both expressly and implicitly, agreed to:

(a) Safeguard all assets and monies placed in its care by David, Inc.;

(b) Actively monitor the account under industry norms and by using the latest information at its disposal for any signs of fraud or unauthorized activity and to take all necessary steps to ensure that the assets and funds are protected from such fraud and unauthorized activity including a promise to use all industry standards such as requiring operating agreements, minutes, etc. to open new accounts under David, Inc.'s name; and

(c) Exercise all due care and good faith in the maintenance of the account.

32.   David, Inc. gave valuable consideration to BAC in exchange for the promises described above at ¶ 31.

### E.  DAVID INC.'s CONTRACT WITH DOE #2.

33.   Doe #2 was hired on behalf of David, Inc. to perform accounting services.

34.   An employment contract was entered into between David, Inc. and Doe #2 which required Doe #2 to provide accounting services under prevailing professional norms and applicable accounting regulations, to exercise all due care, diligence and good faith in performing such services, and a requirement that included an obligation to report any suspicious activity to David, Inc.

35.   Doe #2 was compensated by David, Inc. for accounting services in full.

36.   As a person rendering professional accounting services, Doe #2 knew or reasonably should have known, with the exercise of the care as required under prevailing norms for accountants and the terms of the employment contract, that the Parmars were embezzling hundreds of thousands of dollars from David, Inc.  Even if Doe #2 did not know of the embezzlement, it is alleged that Doe #2 should have uncovered such embezzlement using reasonable care and diligence.

37.   Upon belief, it is alleged that Doe #2 actively assisted the Parmars in their embezzlement from David, Inc., either actively or passively, and that such assistance took the form of failing to report evidence of embezzlement that Doe #2 knew about and further, by creating financial documents and statements which facilitated the fraud by concealing the activities of the Parmars.

38.   Doe #2 breached his or her contractual obligations to David, Inc. by failing to uncover the embezzlement and fraud, by failing to report the embezzlement which he or she should have reasonable known about, by failing to act in good faith towards David, Inc. and in assisting the Parmars in creating the fictitious financial documents to hide evidence of the misappropriation of David, Inc. monies.

39.   David, Inc. has suffered damages as a direct and proximate result of the breach of the employment contract by Doe #2 where the damages were avoidable.

40.   All of David, Inc.'s rights under the contract with the Parmars, Doe #1, Doe #2 and BAC have been assigned to Plaintiff Kamal K. Patel without recourse by David, Inc.

## F.  THE PARMARS CREATE A CRIMINAL ENTERPRISE.

41.  By all measures, the Parmars' betrayal of and abandonment of their contractual obligations to Dr. Patel and David, Inc. commenced sometime in 2008 upon learning of an opportunity to construct a Holiday Inn Express & Suites ("HIE-Pratt") in the Pratt, Kansas market and ended sometime in late 2011 when they were discovered and fired.  At the time of this opportunity to venture into the Pratt market, the Parmars were contractually obligated to David, Inc. to provide the services as Directors as described at ¶ 27, supra.  The Parmars desired to usurp this opportunity for themselves but were without the financial means to take advantage of this opportunity.

42.  The Parmars were undeterred.  Not ones to let duty or morality be an impediment, they pressed on with their personal agenda.  They devised various illegal schemes with the goal to accumulate the money necessary for constructing the HIE-Pratt.

43.  These schemes were aimed at multiple victims.  David, Inc. was one such victim of the Parmars' greed and racketeering activities.

## G.  THE VICTIMS.

44.  One of the victims of the Parmars' schemes was K & A Motel, Inc., an Oklahoma corporation.  The Parmars schemed to defraud K & A Motel, Inc. of a sum of $300,000.00.  To briefly summarize the scheme related to K & A, the Parmars decided to use a power of attorney which had been given to them by K & A to handle litigation to their advantage.  The Parmars sold the lawsuit to the defendants for a kickback of $300,000.00 and dismissed it without K & A's consent.  *See Patel v. Parmar, Civil No. 6:13-CV-01444 (D. Kansas).*

45.  David, Inc. was an intended victim.  The Parmars intended to deprive David, Inc. of a significantly larger sum of money and thus, devised numerous ingenuous schemes to accomplish their goals.

46.  The various schemes targeting David, Inc. were extensive in time, scope and planning.  They spanned a period of time of approximately three (3) years, involved meticulous preparation and consisted of at least 84 separate and discrete illegal acts which included mail, wire and financial fraud, violations of

the Currency Transaction Reporting laws; laundering of monetary instruments, and engaging in transactions involving property derived from unlawful activity.

47.  Through these various schemes, as will be more fully described here, the Parmars intended to accumulate the money necessary to make the down payment on the construction of the HIE-Pratt and did in fact manage to divert the funds to accomplish this goal.

## H.  THE PLOTS AND SCHEMES UNCOVERED TO DATE.

48.  The Parmars devised and implemented various illegal and devious schemes in furtherance of their illicit goals.

49.  *First Scheme*:  One of these schemes was to recruit a BAC employee and then use this source to open phony bank accounts in David, Inc.'s name to siphon off David, Inc.'s monies.

50.  Sometime in July 2008, Wilson or Grace Parmar or both ***opened a phony account*** at Bank of America **(Account Number 5180 0072 4687)** in the name of David, Inc. with the intention of using this phony account to pay personal expenses, all in furtherance of the scheme as described at ¶¶ 41-49, supra.

51.  Sometime in August 2009, Wilson or Grace Parmar or both ***opened a second phony account*** at Bank of America (Account Number 5180 0330 3348) in the name of David, Inc. with the intention of using this phony account to divert funds from David, Inc. to fund the construction of the HIE-Pratt, all in furtherance of the schemes as describes at ¶¶ 41-49, supra.  The account was used for this illegal purpose until April 2011.

52.  *Second Scheme:*  In a second scheme, Wilson or Grace Parmar or both would ***obtain large cash withdrawals on their personal credit cards*** to be eventually used to fund the HIE-Pratt.  These personal credit card balances would then be paid off by ***wiring funds or mailing checks*** from David, Inc. accounts to the credit card companies.

(a) This scheme began in approximately September 2007 and ended in approximately July 2010.

(b) Through this scheme, the Parmars wire transferred at least **$128,028.91** and used the mails to send checks of at least **$48,073.57** from David, Inc. accounts to pay off their credit card cash advances.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

(c) The cash transactions would be structured as to avoid Currency Transaction Reporting ("CTR") requirements.

(d) One aspect of this scheme was to make these withdrawals while vacationing in India so that the cash could be deposited in financial institutions in India and moved to the United States as "clean money" and avoid a paper trail;

(e) The cash would also be laundered by either converting it to cashiers checks for deposit into Peace, Inc. or other accounts controlled by the Parmars or into financial institutions in the United States or in India for eventual repatriation to the United States.

53. *Third Scheme:* A third scheme involved Wilson or Grace Parmar or both **_withdrawing large sums of cash from David, Inc. accounts and converting it to cashiers checks payable to themselves_** from Bank of America. The details of the scheme are as follows:

(a) This scheme began in approximately July 2008 (when the HIE-Pratt opportunity first presented itself) and continued through approximately April 2011 and involved numerous individual transactions.

(b) These cashiers checks would be laundered by either (1) sending them to India to be deposited into a financial institution there and repatriated back to the United States as "clean money" for use in funding the HIE-Pratt, (2) depositing the cashiers checks into Peace, Inc. accounts to fund the HIE-Pratt, or (3) depositing the cashiers checks into individual accounts through which the HIE-Pratt would eventually be funded.

(c) An amount conservatively estimated at **$199,143.03** was withdrawn through this scheme.

54. *Fourth Scheme:* A fourth scheme involved Wilson or Grace Parmar or both **_withdrawing large sums of money from David, Inc. accounts by wire transferring the money out_** of the accounts. The details of this scheme are as follows:

(a) This scheme began in approximately September 2008 and lasted until approximately December 2009.

(b) Through this scheme, the Parmars wire transferred at least **$32,350.00** from David, Inc. accounts in numerous individual transactions.

55. *Fifth Scheme:* A fifth Scheme involved Wilson or Grace Parmar or both **_writing checks directly from David, Inc. to pay for the HIE-Pratt project._**

56. *Sixth Scheme:* A sixth scheme involved Wilson or Grace Parmar or both **_stealing incoming revenue checks for David, Inc._** Pursuant to this scheme, the Parmars would steal incoming checks payable to David, Inc., endorse them with the authority given them as Managers and Directors and

Kamal K. Patel v. Peace, Inc.
Civil Complaint

misappropriate them.  Upon information and belief, it is alleged that at least $76,000.00 in incoming checks was stolen from the mails and deposited into the phony accounts for theft by the Parmars.

57.  It is alleged upon information and belief that the Parmars recruited a Bank of America employee to assist them in carrying out this scheme.  The BAC employee made it possible to structure the transactions as to avoid raising any sort of warning flags.  The BAC employee allowed evidence of structuring to go unreported thus avoiding CTR requirements.  The BAC employee permitted the Parmars to withdraw large amounts of cash and converted this cash to cashiers checks payable to the Parmars or wire transfer large amounts from David, Inc. to personal accounts without raising a red flag.  The BAC employee made it possible to avoid detection by permitting the Parmars to change the address on the David, Inc. accounts to their personal residence so as to ensure all statements, documents, cancelled checks, etc. were mailed to them thereby facilitating concealment of the illegal conduct.

58.  It was also an integral part of the Parmars' scheme to conceal their illegal activities as to avoid detection.  To avoid detection, the Parmars engaged in the following actions:

(a) Changed the address on David, Inc. bank accounts to their personal residence so as to have all statements, documents, cancelled checks, etc. mailed to them to facilitate concealment;

(b) Fired the accountant hired by Dr. Patel and replaced her with one of their own choosing (Doe #2) who facilitated concealment as described elsewhere in this complaint;

(c) Routed the money to avoid detection including sending cash or cashiers checks to India for deposit into financial institutions and then bringing the money back to the United States disguised as legitimate funds;

(d) Used the phony accounts created in David, Inc.'s name to divert attention;

(e) Vigorously opposed any attempt by Dr. Patel for access to David, Inc. documents even going as far as having an attorney intervene to stop Dr. Patel's efforts to access such documents by invoking their authority as Directors and Officers (despite Dr. Patel's controlling interest).

59.  Plaintiff believes that other innovative schemes exist yet to be uncovered and that he will seek to amend the complaint once these are uncovered through discovery.

## I.  THE DISCRETE ILLEGAL TRANSACTIONS PURSUANT TO THESE SCHEMES.

60.  The Parmars engaged in the following discrete illegal acts in furtherance of the first scheme as described above at ¶¶ 49 and 51 *(opening the phony bank accounts):*

(a) Opened a phony bank account at Bank of America under David, Inc.'s name sometime in July 2008 under Account Number 5180 0072 4687, as described at ¶¶ 49 and 50, supra.

(b) Opened a phony account at Bank of America under David, Inc.'s name sometime in August 209 under Account Number 5180 0330 3348, as described at ¶¶ 49 and 51, supra.

(c) Through multiple and discrete transactions spanning a time period from August 2009 through November 4, 2010, an amount conservatively calculated at $111,958.33 was secretly deposited into the phony account ending with "3348" by Wilson or Grace Parmar or both.

(d) Through multiple and discrete transactions spanning a time period from July 24, 2008 through May 4, 2010, an amount conservatively calculated at *$17,680.00* was secretly deposited into the phony account ending with "4687" by Wilson or Grace Parmar or both.

61.   The Parmars engaged in the following discrete illegal acts in furtherance of the second illegal

scheme as described at ¶ 52, supra *(embezzlement via personal credit cards):*

(a) Wilson or Grace Parmar or both would obtain large cash withdrawals on his or her personal credit cards.

(b) One method of laundering the cash so obtained would be to convert it to cashiers checks for deposit ultimately into a financial institution in the United States.

(c) The cash would also be obtained while the Parmars were vacationing in India and this cash would either be deposited into a financial institution in India as and repatriated back to the United States as laundered funds.

(d) The money would then be used to fund the construction of the HIE-Pratt.

(e) The credit card balances would be paid off by embezzling the funds from David, Inc. either by directly wiring the money out of David, Inc. bank accounts or writing checks drawn on David, Inc. bank accounts.

(f) Through multiple and discrete illegal transactions spanning a time period from September through July 26, 2010, Wilson or Grace Parmar or both **wired** an amount conservatively calculated at *$128,028.91* out of David, Inc. accounts to pay of their personal credit card bills. The wire transfers included the following:

| Date: | | Wired Amount: |
|---|---|---|
| 9/24/2007 | $ | 6,999.00 |
| 12/7/2007 | | 6,784.99 |
| 2/12/2008 | | 12,876.67 |
| 5/9/2008 | | 2,252.10 |
| 11/10/2008 | | 4,413.20 |
| 12/15/2008 | | 8,876.29 |
| 12/15/2008 | | 5,064.61 |
| 1/12/2009 | | 471.18 |
| 5/28/2009 | | 2,900.24 |

| 12/18/2009 | 5,988.54 |
| 12/21/2009 | 2,056.29 |
| 12/21/2009 | 1,116.67 |
| 12/21/2009 | 327.00 |
| 12/21/2009 | 258.00 |
| 1/8/2010 | 5,783.38 |
| 2/16/2010 | 3,143.41 |
| 2/16/2010 | 271.00 |
| 2/22/2010 | 2,542.93 |
| 2/22/2010 | 6,831.61 |
| 3/8/2010 | 2,156.94 |
| 3/22/2010 | 13,891.34 |
| 3/22/2010 | 1,314.36 |
| 4/13/2010 | 10,800.00 |
| 6/28/2010 | 3,389.54 |
| 7/26/2010 | 4,937.83 |

(g) Through multiple and discrete illegal transactions spanning a time period from September 4, 2008 through September 4, 2009, Wilson or Grace Parmar or both **wrote checks** an amount conservatively calculated at *$45,703.57* out of David, Inc. accounts and **mailed** these checks via the U.S. mails to the credit card companies to pay of their personal credit card bills.  The mail fraud with checks included the following:

| Date: | Check Amount: |
|---|---|
| 9/8/2008 | $   8,331.01 |
| 10/2/2008 | 19,723.26 |
| 11/6/2008 | 5,240.84 |
| 11/18/2008 | 3,316.26 |
| 9/4/2009 | 9,092.00 |
| 9/17/2009 | 2,580.77 |

62.   The Parmars engaged in the following discrete illegal acts in furtherance of the third illegal scheme as described at ¶ 53, supra *(withdrawing cash as cashiers checks payable to themselves):*

| Date: | Amount: |
|---|---|
| 7/25/2008 | $   50,250.00 |
| 7/25/2008 | 6,288.25 |
| 11/2/2009 | 27,000.00 |
| 11/13/2009 | 25,000.00 |
| 11/13/2009 | 25,000.00 |
| 2/9/2010 | 10,000.00 |
| 11/29/2010 | 3,123.33 |
| 12/22/2010 | 3,123.33 |
| 1/28/2011 | 3,123.33 |
| 4/5/2011 | 25,481.45 |

63. The Parmars engaged in the following discrete illegal acts in furtherance of the fourth illegal scheme as described at ¶ 54, supra *(withdrawing cash from David, Inc. via wire transfers):*

| Date: | | Amount: |
|---|---|---|
| 7/24/2008 | $ | 3,000.00 |
| 10/21/2008 | | 2,000.00 |
| 12/18/2008 | | 9,000.00 |
| 11/6/2009 | | 12,000.00 |
| 12/2/2009 | | 1,500.00 |
| 12/2/2009 | | 2,500.00 |

64. The Parmars wrote checks from David, Inc. accounts to directly pay for the construction of the HIE-Pratt in furtherance of the fifth scheme as described at ¶ 55, supra, in two independent transactions as follows:

| Date: | Amount: |
|---|---|
| 10/1/2008 | $  155,000.00 |
| 10/29/2008 | 10,000.00 |

65. The Parmars stole checks from the U.S. mails addressed to David, Inc. and/or La Quinta Inn & Suites, all in furtherance of the sixth scheme as described at ¶ 56, supra, as follows:

| Date: | Amount: |
|---|---|
| 8/19/2009 | $  27,413.12 |
| 10/23/2009 | 12,095.79 |
| 11/13/2009 | 37,072.31 |

66. The majority of funds embezzled from David, Inc. as described at ¶¶ 49-65, supra, were used to fund the construction of the HIE-Pratt.

67. All of the actions as described here at ¶¶ 49-65 were unauthorized by Dr. Patel.

## J. FACTS PERTINENT TO THE ESTABLISHMENT OF A CONSRUCTIVE TRUST.

68. The Parmars had a duty of good faith imposed upon them by the terms of the employment contract with David, Inc. as Directors and General Managers.

69. The Parmars were required to exercise the utmost honesty, integrity and fidelity towards David, Inc. and perform all of the obligations in good faith.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

70. The Parmars were prohibited from engaging in any transactions which (i) used any corporate assets or funds for personal use, (ii) would constitute a conflict of interest, (iii) would constitute self-dealing, and (iv) would be considered a divestiture of corporate assets for personal use.

71. Through the previously described unconscionable schemes, the Parmar diverted hundreds of thousands of dollars from David, Inc. which monies were used for the construction of the HIE-Pratt or to pay the down-payment.

72. The funds diverted from David, Inc. can be directly traced to the construction of the Holiday Inn Express in Pratt, Kansas.  In fact, the majority of the upfront capital invested by the Parmars constituted the ill-gotten proceeds of the embezzlement from David, Inc.

73. On October 1, 2008, a check in the amount of $ 155,000.00 was written from David Inc.'s BAC account and this check was used to pay for the purchase of the land in Pratt, Kansas on which the HIE-Pratt was constructed.  The purchase of this land is directly traceable to David, Inc. funds.

74. In September of 2008, the Parmars had to pay franchise fees to Holiday Inn for the Pratt franchise in the amount of $55,500.00.  The money for this payment is directly traceable to David, Inc. monies.  A total of % 56, 538.25 was withdrawn from David, Inc. BAC account as cashiers check a few days prior to the Holiday Inn payment.

75. On November 9, 2009, the Parmars made a deposit of $ 480,000.00 into the accounts of Peace, Inc. for the construction of the HIE-Pratt. This deposit was in the form of a cashiers check. Between the dates of September 2007 and the date of this deposit, an amount approximating this amount was diverted from David, Inc. through the various schemes, as described elsewhere in this complaint. The $ 480,000.00 cashiers check was David, Inc. funds.

76. On November 9, 2009, the Parmars deposited a cashier's check in the amount of $25,000.00 into a Peace, Inc. account to be used for the construction of the HIE-Pratt.  A week prior to this deposit, the Parmars withdrew $27,000.00 as a cashiers check from David Inc. accounts.  The $25,000.00 cashiers check deposited into Peace, Inc. accounts was David, Inc. funds.

77. On November 9, 2009, the Parmars deposited cash currency in the amount of $23,910.00 into a Peace, Inc. account to be used for the construction of the HIE-Pratt.  A few days prior to this deposit, the Parmars stole a check in the amount of $12,095.79 made out to David, Inc. and/or La Quinta Inns & Suites and cashed it.  Also, a few days prior to November 9, 2009, the Parmars wire transferred a sum of $ 12,000.00 from David, Inc.'s BAC account into their personal account.  The currency deposit was David, Inc.'s monies.

78. On November 13, 2009, the Parmars withdrew $50,000.00 as cashiers check from David, Inc.' BAC account structured as two cashiers checks for $25,000.00 each.  On the same day as this withdrawal, the Parmars deposited cashiers checks totaling $47,000.00 into a Peace, Inc. account for the construction of the HIE-Pratt.  The $47,000.00 deposit into Peace, Inc. was David, Inc.'s monies.

79. It is further alleged that the various monies brought from India were the result of the laundering of David, Inc. monies and rightfully belonged to David, Inc.

80. The acquisition of the land on which the HIE-Pratt is constructed and the construction costs of the HIE-Pratt can be directly traced to the monies embezzled from David, Inc.

81. The HIE-Pratt cannot in good conscience be allowed to remain in the possession of either Peace, Inc. or either of the Parmars.

82. The HIE-Pratt and all of its profits rightfully belong to David, Inc.

**K.  PARMARS' BREACH OF THE CONTRACT WITH DR. PATEL.**

83. The Parmars' actions of embezzling monies from David, Inc. and the La Quinta Inn & Suites, as alleged in this complaint, breached the contractual obligations the Parmars owed to Dr. Patel that they would act with the highest degree of care, loyalty, fidelity, trustworthiness, and transparency.

84. Dr. Patel suffered serious and quantifiable damages as a direct and proximate result of the multiple breaches of the contract entered into between him and the Parmars including damages from losses attributable to a decrease in his share of the profits and value of his shares in the corporation.

## L.   PARMARS' BREACH OF THE EMPLOYMENT CONTRACT WITH DAVID, INC. AS DIRECTORS AND AS GENERAL MANAGERS.

85.   The actions of the Parmars as described elsewhere in this suit in which they embezzled monies from David, Inc. via the multiple schemes and in which they usurped David, Inc.'s corporate opportunity breached their contract of employment as General Managers and their contract of employment as Directors with David, Inc.

86.   The Parmars' actions failed to use the highest degree of good faith, fidelity, loyalty, and trustworthiness as required by the contract.

87.   As a direct and proximate result of the multiple breaches by the Parmars, David, Inc. suffered significant damages including but not limited to almost $700,000.00 of embezzlement and a decrease in the value of its assets.

88.   All of the actions and breaches of the Parmars were accomplished using fraud and deceit.

## M.  DOE #1 AND BANK OF AMERICA'S BREACH OF CONTRACT WITH DAVID, INC.

89.   BAC had a contractually imposed obligation to David, Inc. to safeguard its assets, actively monitor the account for fraud, suspicious, and unauthorized activity, and use due care and good faith in the maintenance of David, Inc.'s accounts.  Likewise, Doe #1 had an obligation, as an employee of BAC, to David, Inc. in the same manner as BAC's responsibility.

90.   BAC and Doe #1 knew that David, Inc. was a corporation with multiple shareholders.

91.   BAC and Doe #1 knew that Wilson and Grace Parmar were employees of David, Inc. and only minority shareholders and that there were other shareholders to whom the Parmars owed a fiduciary obligation.

92.   BAC and Doe #1 knew that under existing banking regulations and/or law, any person who seeks to open an account under the corporate name must present the bank with an operating agreement, minutes and resolutions authorizing the action, and other documentation in which the authority to open such an account can be documented and verified.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

93. BAC and Doe #1 knew that the Parmars were without legal authority to use David, Inc.'s monies as their own and without authority to open bank accounts for David, Inc.

94. BAC is charged with knowing of and keeping abreast of common embezzlement schemes in which a bank is used to perpetrate embezzlement.

95. It is a common scheme knowing to banking investigators that employees of small to medium businesses open phony bank accounts in the name of the business for the purpose of embezzling from the employers.

96. Another common scheme used by employees of corporations is to corporate/business checks and funds to pay for personal bills.

97. On July 25, 2008, Wilson Parmar went to the Dodge City branch of BAC and withdrew $56,538.25 from David, Inc. accounts and had this money given to him in the form of two cashiers checks payable to himself.

98. On November 2, 2009, Wilson Parmar went to the Dodge City branch of BAC and withdrew $27,000.00 and had this money given to him in the form of a cashier check payable to himself.

99. On November 13, 2009, Wilson Parmar went to the Dodge City branch of BAC and withdrew $25,000.00 from David, Inc. accounts and had this money given to him in the form of a cashier check payable to himself.

100. On January 28, 2011, Wilson Parmar went to BAC and withdrew #3123.33 in cash from David, Inc. accounts.

101. On April 5, 2011, Wilson and/or Grace Parmar went to the Dodge City branch of BAC and withdrew $25,481.45 and liquidated this specific BAC account they had opened in the name of David, Inc.

102. On each instance described at ¶¶ 97-101, supra, BAC did not ascertain whether the Parmars were authorized to make such withdrawals from David, Inc. accounts and did not ask for documentation such as corporate resolutions required for such withdrawals.

103.  It was unreasonable for BAC to believe that the Parmars had authority to withdraw such large sums from a corporation in which they had only a minority stake for personal use.  It was also unreasonable for BAC to ignore the suspiciously structured transactions such as requesting cashiers checks when they had an existing bank account at BAC and withdrawing sums in small increments.

104.  BAC actively assisted the Parmars through Doe #1 in facilitating the embezzlement.

105.  The withdrawals of the monies from David, Inc. accounts as described at ¶¶ 97-101, supra, were unauthorized by any of the majority shareholders of the corporation.

106.  Between the dates of September 24, 2007 and July 26, 2010, the Parmars wire transferred an amount conservatively estimated at $128,028.91 from David, Inc. accounts without authority.

107.  BAC knew or should have known that the Parmars could not self-deal as fiduciaries of David, Inc. and had actual or constructive knowledge that the Parmars were engaging in illegal activities against David, Inc.  BAC acted in bad faith by allowing the Parmars to deplete David, Inc.'s monies.

108.  Sometime in July 2008, the Parmars went to BAC and changed the mailing address of David, Inc.'s accounts to their personal residence to facilitate concealment of the planned criminal activities.  The Parmars had not authority for this action.  BAC should have asked the Parmars for evidence of their authority but did not do so.

109.  Sometime in July 2008, the Parmars opened up a bank account under the name of David, Inc. using their personal residence address.  BAC was legally obligated to obtain authorization documents from the corporation but did not do so.

110.  Sometime in August 2008, the Parmars opened up a second bank account under the name of David, Inc. using their personal residence address.  BAC was legally obligated to obtain authorization documents from the corporation but did not do so.

111.  It was unreasonable for BAC to believe that employees of David, Inc. had the authority to effect address changes on the corporate account or to open up multiple other accounts using their personal residence.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

112.  BAC had constructive knowledge of the Parmars' embezzlement due to the aid of Doe #1 to the Parmars' cause.

113.  The circumstances were so cogent that it was bad faith for BAC to remain passive. By facilitating the Parmars' scheme, the bank acted in bad faith.

114.  BAC and Doe #1 breached their contractual obligations to David, Inc. by:

(a) Failing to safeguard David, Inc.'s assets entrusted to it;

(b) Failing to actively monitor the account for fraud and suspicious activity;

(c) Acting in bad faith in violation of the contract's implicit requirements under Kansas law.

114.  As a direct and proximate result of the breaches by BAC and Doe #1, David, Inc. suffered identifiable and specific damages conservatively estimated at $671,340.28.

115.  The conduct of the Parmars in opening the phony bank accounts and changing the mailing address so as to facilitate concealment of their activities was with the specific intention to hide their activities from the other shareholders.  The Parmars used their position of control of David, Inc. to conceal their activities from the other shareholders.  David, Inc.'s other shareholders were in fact deceived by the Parmars' concealment actions and did not learn of these shenanigans until after the Parmars were terminated in late 2011.

116.  The Parmars acted individually and jointly in the aforedescribed illegal activity.  In committing the above actions, the Parmars are guilty of oppression, fraud and malice towards David, Inc. and Dr. Patel.

## N.  DOE #2's BREACH OF CONTRACT WITH DAVID, INC.

117.  Doe #2 and David, Inc. entered into a contractual relationship for Doe #2 to perform accounting services using all due skill, diligence and good faith and to perform such services under prevailing standards for accountants.

118.  Doe #2 breached his or her contract with David, Inc. when he/she assisted the Parmars in concealing evidence of their malfeasance and embezzlement.

119.   Doe #2 knew or reasonably should have known of the embezzlement but covered up evidence of the embezzlement and made financial documents for David, Inc. doctored to hide evidence of the malfeasance.

120.   As a direct and proximate result of Doe #2's actions in violation of his contractual duties, David, Inc. suffered significant damages.

## O.  RACKETEERING.

### (1) "Persons".

121.   Wilson Parmar is an individual defined as a "person" under Title 18 U.S.C. § 1961(3). Grace Parmar is an individual defined as a "person" under Title 18 U.S.C. § 1961(3).

### (2) "Enterprise"

122.   Peace, Inc. is a corporation formed under the laws of Kansas engaged in the hospitality industry.  It is the owner and operator of the Holiday Inn Express & Suites in Pratt, Kansas and is an "enterprise" engaged in business that affects interstate commerce.  It will be referred to as the "Peace, Inc. Enterprise".

123.   David, Inc. is a corporation formed under the laws of Kansas engaged in the hospitality industry.  It is the owner and operator of the La Quinta Inns & Suites in Dodge City, Kansas and is engaged in business that affects interstate commerce.  It is an enterprise as defined by Title 18 U.S.C § 1964(4) and will be referred to as the "David, Inc. Enterprise,"

124.   Wilson and Grace Parmars are officers and directors in Peace, Inc. as well as employed by Peace, Inc. in other capacities such as the day to day operations of the HIE-Pratt.  At all times relevant here, Wilson and Grace Parmar had management and operational control of the Peace, Inc. Enterprise.

124.   At all times relevant to this action, Wilson and Grace Parmar were officers and directors of David, Inc. as well as employed by David, Inc. in other capacities such as day to day operations of the La Quinta Inn in Dodge City.  However, at all times relevant here, Wilson and Grace Parmar had management and operational control of the affairs of the David, Inc. Enterprise.

125. At the time of the events complained of in this suit, Peace Inc. was a corporation who had not yet built the HIE-Pratt and whose affairs consisted of plans to acquire land for the HIE-Pratt as well as plans to eventually construct the HIE-Pratt.

126. At all times relevant to this suit, David, Inc. was a corporation which owned and operated the La Quinta Inn in Dodge City, Kansas, in business affecting interstate commerce.

127. Wilson and Grace Parmar conducted, participated in, and managed the affairs of Peace, Inc. They took all steps necessary for Peace, Inc. to accomplish its stated goal of constructing the HIE-Pratt, including by using illegal means.

128. Wilson and Grace Parmar conducted, participated in, and managed the affairs of David, Inc. at all times relevant to this suit.

129. Wilson and Grace Parmar conducted the affairs of the Peace, Inc. Enterprise by being the persons who made all decisions and took all steps necessary for Peace, Inc. to construct the HIE-Pratt, including the acquisition of the land on which it was to be built and the accumulation of the funds needed for the construction.

130. Wilson and Grace Parmar conducted the affairs of the David, Inc. Enterprise by being the persons who made all decisions through which David, Inc. was bled off from its assets.

### 3. *"Pattern of Racketeering Activity"*

131. In conducting the affairs of the Peace, Inc. Enterprise and the David, Inc. Enterprise, both Wilson and Grace Parmar engaged in a pattern of racketeering activity which was extensive in scope, both in the nature of the actions which spanned international borders and in the extensiveness of the multiple schemes employed, and which and spanned a period of almost 4 years.

132. The pattern of racketeering activity conducted on behalf of the Peace, Inc. Enterprise commenced sometime in 2008 when the Parmars learned of an opportunity for a Holiday Inn Express in Pratt, Kansas.

133. Multiple schemes were invented through which the illegal acts would be perpetrated.

134. One of the schemes involved K & A Motel, Inc., an Oklahoma corporation. The Parmars

Kamal K. Patel v. Peace, Inc.
Civil Complaint

were given Power of Attorney to handle litigation K & A Motel was pursuing regarding failed real estate transaction. In that litigation, the Parmars used their POA authority to make a deal with one of the defendants in which they would sell out the lawsuit in exchange for a secret payoff of $300,000.00 that they intended to apply towards Peace, Inc. Enterprise's HIE-Pratt project.

135. One scheme involved perpetrating a fraud against Dodge City Hospitality, Inc., a Kansas corporation. The Parmars were minority shareholders of DCH but were its Directors. DCH was in the process of constructing a hotel. The Parmars agreed to a secret agreement with the contractor in which the contractor increased the construction cost that would be kicked back to the Parmars.

136. The Parmars, while acting as directors and operators of both the Peace, Inc. Enterprise and the David, Inc. Enterprise, devised multiple schemes targeting David, Inc. to fund Peace, Inc. Enterprise's HIE-project. These schemes included the following:

(a) Phony bank accounts would be created at Bank of America in the name of David, Inc. using the Parmars' home address in order to divert David, Inc. funds.

(b) Large cash advances would be obtained on personal credit cards and the credit card balances would be paid off using David, Inc. money.

(c) Large amounts of money would be withdrawn from David, Inc. accounts and taken as cashiers checks for ultimate deposit into Peace, Inc. accounts.

(d) Money would be sent to India to be laundered and repatriated to the United States.

(e) Incoming checks for David, Inc. would be stolen and deposited into accounts that only the Parmars controlled.

137. The Parmars devised multiple methods to conceal their activities. These included:

(a) Firing the accountant initially chosen by the investors and replacing her with their own accountant through which the financial shenanigans could be concealed.

(b) Changing the mailing address on David, Inc. accounts so that only the Parmars would receive both electronic and physical mail and through which they could control the dissemination of such financial information.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

(c) Structuring currency transactions to avoid CTR requirements including recruitment of a bank employee to assist in avoiding suspicion.

137.  Over a hundred separate transactions were conducted through these various schemes from 2007 to mid-2011 involving multiple victims and transactions spanning continents.

### 4.  "Predicate Acts"

138.  Paragraphs 60 through 67, supra, describe the various predicate acts in detail and are hereby incorporated here as if fully set forth.

139.  The numerous predicate acts described at ¶ 60(a) & (b), supra, in opening phony bank accounts and using these accounts to divert David, Inc. monies constituted financial fraud.  The acts described at ¶ 60(c) & (d) consisting of depositing stolen checks into these accounts of wiring money into these accounts from David, Inc. constituted both mail and wire fraud, financial fraud and money laundering.

140.  The numerous predicate acts described at ¶ 61(a)-(f) in obtaining large cash withdrawals and wiring the payment from David, Inc. accounts constituted wire fraud and financial fraud. Furthermore, the transactions routing the money through India to be laundered constituted money laundering and its use to fund the HIE-Pratt project constituted the unlawful engaging in monetary transactions with the proceeds of illegal activity.

141.  The numerous predicate acts described at ¶ 61(a)-(e) & (g) in obtaining large cash withdrawals and mailing checks for payment from David, Inc. accounts constituted mail fraud and financial fraud.  The transactions routing the money through India to be laundered constituted money laundering and its use to fund the HIE-Pratt project constituted the unlawful engaging in monetary transactions with the proceeds of illegal activity.

142.  The numerous predicate acts described at ¶ 62 in withdrawing money from David, Inc. accounts as cashiers checks and routing the checks through various institutions constituted financial fraud, mail fraud, and money laundering.  It use to fund the HIE-Pratt project constituted unlawful engaging in monetary transactions from illegally derived money.

143.   The numerous predicate acts described at ¶ 63 in withdrawing money from David, Inc. accounts via wire transfers and routing the money through various institutions constituted financial fraud, wire fraud, and money laundering.  It use to fund the HIE-Pratt project constituted unlawful engaging in monetary transactions from illegally derived money.

144.   The predicate acts as described at ¶ 64 regarding the use of David, Inc.'s checks to purchase the land on which the HIE-Pratt was built constituted financial fraud and a violation of the prohibition against engaging in monetary transactions from the proceeds derived from illegal activity.

145.   The predicate acts described at ¶ 65 regarding the theft of David, Inc. checks from the mails for deposit into the secret accounts to be used for funding the HIE-Pratt project constituted mail fraud, financial fraud, money laundering and violations of the prohibition in engaging in monetary transactions from the proceeds of illegal activity.

### 5.  *"Injury to Business or Property"*

146.   The numerous victims identified here were all injured in their business or property as a direct result of the illegal actions of the Parmars and the criminal enterprises.

147.   David, Inc. was injured in its property.  It suffered a direct and identifiable loss of over $700,000.00 in the amount of money by which it was defrauded.

# V.

## CAUSES OF ACTION

148.  Paragraphs 1 through 147, supra, are hereby incorporated into these Causes of Action as if fully set forth herein.

### COUNT ONE

### ESTABLISHMENT OF A CONSTRUCTIVE TRUST
*(Defendants Wilson Parmar, Grace Parmar, Peace, Inc. and HIE-Pratt)*

149.  Defendants Wilson and Grace Parmar and Peace, Inc. obtained legal right and title to the Holiday Inn Express & Suites in Pratt, Kansas by unconscionable conduct, artifice, concealment, deceit and questionable means.

150.  These defendants cannot be allowed to maintain possession of such property in good conscience and equity.

151.  The funds used to construct the HIE-Pratt can be directly traceable to monies embezzled from David, Inc.

152.  This court is requested to impose a Constructive Trust placing the Holiday Inn Express & Suites in Pratt, Kansas into said trust in favor of Plaintiff.

153.  The court is requested to order an accounting of all profits from the HIE-Pratt since its opening and order that such funds be placed in the constructive trust.

154.  This court is requested to order that the Parmars and/or Peace, Inc. quitclaim the Holiday Inn Express & Suites in Pratt, Kansas to Plaintiff.

### COUNT TWO

### BREACH OF CONTRACT WITH ATUL PATEL, M.D,
*(Defendants Wilson and Grace Parmar)*

155.  The Wilson Parmar and Grace Parmar each breached their individual contractual promises to Dr. Patel as set out in this complaint by their acts of misappropriation of the assets of David, Inc. and the La Quinta Inn.

156.   Dr. Patel had a vested interest in the contract with the Parmars since the value of his investment and the income derived from this investment was directly proportional to the profit and loss from the La Quinta Inn.

157.   Dr. Patel suffered damages as a direct and proximate result of Wilson and Grace Parmar's breaches of their individual obligations under the contract, including quantifiable damages amounting to Dr. Patel's proportionate share of the monies embezzled from David, Inc.

## COUNT THREE

## WILSON AND GRACE PARMARS' BREACH OF CONTRACT WITH DAVID, INC. AS ITS DIRECTORS.
### *(Defendants Wilson and Grace Parmar)*

158.   As Directors of David, Inc., Wilson and Grace Parmar each had a contractual obligation to David, Inc. as described elsewhere in this complaint.

159.   Wilson and Grace Parmar each breached their contractual obligations to David, Inc. by committing the acts of malfeasance, as described elsewhere in this complaint.

160.   The following acts each constituted a separate breach of their individual contractual terms:

(a) Breach of the agreement to act in the best interests of David, Inc.

(b) Breach of the agreement to act with the utmost good faith.

(c) Breach of the agreement from usurping corporate opportunity and its prohibition against self-dealing and engaging in situations which present a conflict of interest.

(d) Breach of the agreement to provide honest services.

(e) Breach of the agreement to act with loyalty to David, Inc.

(f) Breach of the agreement to act under a strict duty of care.

(g) Breach of the agreement prohibiting unauthorized expenditures, withdrawals, and distribution of corporate assets, capital or funds.

161.   As a direct and proximate result of the aforedescribed breaches, David, Inc. suffered significant damages conservatively estimated at over $700,000.00.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

## COUNT FOUR

### WILSON AND GRACE PARMARS' BREACH OF CONTRACT WITH DAVID, INC. AS ITS EMPLOYEES.
*(Defendants Wilson and Grace Parmar)*

162.   Both Wilson and Grace Parmar were employees of David, Inc. who were employed as General Managers of the La Quinta Inns & Suites in Dodge City, Kansas.

163.   Both Wilson and Grace Parmar were contractually obligated to David, Inc. to provide services as described elsewhere in this complaint.

164.   Wilson and Grace Parmar, individually and in concert with each other and others known and unknown, committed various breaches of their contractual duties as follows:

(a) Breached the contractual duty to bring the highest degree of good faith on behalf of David, Inc.

(b) Breached the contractual provision prohibiting them from profiting at the employer's expense.

(c) Breached the contractual provision mandating that all monies be accounted for and handled honestly and with the utmost honesty.

(d) Breached the contractual provision requiring the operation of the La Quinta Inn in the interests of the shareholders.

165.   Wilson and Grace Parmar each breached the implied term of good faith present in every contract in Kansas.

166.   As a direct and proximate result of the aforedescribed breaches, David, Inc. suffered significant damages conservatively estimated at over $700,000.00.

## COUNT FIVE

### BANK OF AMERICA'S BREACH AND DOE #1'S BREACH OF CONTRACT
#### (Defendants Bank of America and Doe #2)

167.   Bank of America and Doe #2 each breached the contractual duties each possessed, as described elsewhere in this complaint, in the following ways:

(a) Each failed to safeguard the assets of David, Inc. entrusted to the bank.

(b) BAC failed to actively monitor the account for common schemes of fraud or unauthorized transactions.

(c) Failed to exercise good faith in the maintenance of David, Inc.'s bank account.

(d) Assisted the Parmars to commit fraud against David, Inc.

(e) Failed to follow applicable banking regulations requiring corporate authorization for opening bank accounts and engaging in such large-scale monetary transactions.

(f) Failed to use all due care.

168.   David, Inc. suffered significant damages as a direct and proximate result of the acts, as described.

## COUNT SIX

### DOE #2'S BREACH OF CONTRACT WITH DAVID, INC. AS ITS EMPLOYEE
#### (Defendant Doe #2)

169.   Doe #2 had a contractual duty to provide accounting services to David, Inc. as described elsewhere in this complaint.

170.   Doe #2 breached its contractual duty by its actions in actively and/or passively assisting the Parmars in their fraud against David, Inc.

171.   As a direct and proximate result of Doe #2 breach of contract, David, Inc. suffered significant and quantifiable damages, which otherwise could have been avoidable.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

## COUNT SEVEN

### RACKETEERING VIOLATION OF 1962(c) VIA PEACE, INC. ENTERPRISE
#### (Defendants Wilson and Grace Parmar)

172.   Wilson and Grace Parmar, as employees and directors of *Peace, Inc.*, an enterprise engaged in business that affects interstate commerce, conducted the affairs of the Peace, Inc. Enterprise through a pattern of racketeering activity, as described above, with the intent to engage in the aforedescribed criminal conduct and through which conduct, David, Inc. and Dr. Patel suffered injury to their business and property, all of which was foreseeable to both Wilson and Grace Parmar.

173.   Plaintiff seeks maximum damages as allowed by law, treble punitive damages, and attorney fees, including lost profits, as an assignee of David, Inc. and Atul Patel, M.D. to be assessed against each of Defendants Wilson Parmar and Grace Parmar.

## COUNT EIGHT

### RACKETEERING VIOLATION OF 1962(c) VIA DAVID INC. ENTERPRISE
#### (Defendants Wilson and Grace Parmar and Doe #2)

174.   Wilson and Grace Parmar, as employees and directors of *David, Inc.*, an enterprise engaged in business that affects interstate commerce, and Doe #2, as its accountant, conducted the affairs of the David, Inc. Enterprise through a pattern of racketeering activity, as described above, with the intent to engage in the aforedescribed criminal conduct and through which conduct, David, Inc. and Dr. Patel suffered injury to their business and property, all of which was foreseeable to both Wilson and Grace Parmar.

175.   Plaintiff seeks maximum damages as allowed by law, treble punitive damages, and attorney fees, including lost profits, as an assignee of David, Inc. and Atul Patel, M.D. to be assessed against each of Defendants Wilson Parmar, Grace Parmar and and Doe #2.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

## COUNT NINE

### RACKETEERING VIOLATION OF 1962(a)
**(Defendants Wilson and Grace Parmar)**

176.   Wilson and Grace Parmar acquired income from racketeering activity as described elsewhere in this complaint.

177.   Wilson Parmar and Grace Parmar directly and indirectly used the income acquired from the aforedescribed acts of racketeering to create and fund Peace, Inc.'s acquisition of the HIE-Pratt. The funds were channeled into Peace, Inc., which in turn provided a forum from which the Parmars could continue to embezzle and launder their illegally derived proceeds.   Peace, Inc. and the HIE-Pratt are enterprises that are engaged in activities affecting interstate commerce.

178.   The actions of Wilson and Grace Parmar in violation of § 1962(a) directly caused David, Inc. to suffer injuries such that the reinvestment of these funds into Peace, Inc. permitted the cycle of racketeering against David, Inc. to continue.

179.   Plaintiff seeks maximum damages as allowed by law, treble punitive damages, and attorney fees, including lost profits, as an assignee of David, Inc. and Atul Patel, M.D. to be assessed against each of Defendants Wilson Parmar and Grace Parmar.

## COUNT TEN

### RACKETEERING VIOLATION OF 1962(d)
**(Defendants Wilson and Grace Parmar, Doe #1 and Doe #2)**

180.   Wilson and Grace Parmar conspired with each others and others known and unknown including Doe #1 and Doe #2 to violate the provisions of 18 U.S.C. § 1962(a) and (c).

181.   David, Inc. suffered significant financial damages as a direct and proximate result of the conspiratorial acts of Wilson Parmar, Grace Parmar, Doe #1 and Doe #2 of at least the value of the funds embezzled from it, a value conservatively estimated at over $700,000.00.

182. Plaintiff seeks maximum damages as allowed by law, treble punitive damages, and attorney

Kamal K. Patel v. Peace, Inc.
Civil Complaint

fees, including lost profits, as an assignee of David, Inc. and Atul Patel, M.D. to be assessed against each of Defendants Wilson Parmar and Grace Parmar, Doe #1 and Doe #2.

## COUNT ELEVEN

### DISGORGEMENT OF PROFITS
***(Defendants Wilson and Grace Parmar, Peace, Inc. and HIE-Pratt)***

Plaintiff requests that the defendants Wilson and Grace Parmar, Peace, Inc. and HIE-Pratt make a complete accounting of all profits and disgorge all such profits since the opening of the HIE-Pratt.

Kamal K. Patel v. Peace, Inc.
Civil Complaint

## PRAYER FOR RELIEF

WHEREFORE, in light of the above allegations, the Plaintiff respectfully prays that this court grant the following relief:

1. Establishment of a Constructive Trust and an accounting of all profits as Requested at Count One.

2. Declaration establishing title in the Holiday Inn Express-Pratt in the name of Plaintiff.

3. Damages for breaches of the contract as requested at Counts Two through Six, supra, payable from each of the identified defendants in each count to Plaintiff.

4. Punitive damages for the breaches of contract since the breaches were accompanied by fraud.

5. Damages, including treble damages and attorneys fees, as requested in Counts Seven through Nine, for violations of the Civil RICO Act.

6. Disgorgement of profits as requested in Count Ten.

7. Restitution after a full accounting.

8. Attorney fees, costs, and such further relief as justice dictates, including prejudgment interest at the maximum legal rate.

Respectfully submitted on this the 5th day of April, 2014.

Kamal K. Patel
3409 Deer Valley
Edmond, OK 73034
(214) 870-1687
kamalkpatel@icloud.com